elicit or credit the plaintiff's version of the facts, the defendant DIAZ intentionally and deliberately ignored relevant evidence including statements from one or more of the Concourse Village board members present at the October 14, 2012 board meeting, including statements by Kitty Saunders, a Board Member present at the meeting who personally informed defendant DIAZ that the allegations were false, creating a hostile work environment, adverse action and disparate treatment based on race, color and national origin.

44. Several days after the plaintiff emailed her rebuttal to defendant DELDUCA, she was called into the office of Al Rodriquez, then General Counsel to the BBPO and told that she would have to attend Conflict of Interest classes that he would schedule. Plaintiff informed him that she disagreed with the reprimand and warning and that she issued a rebuttal showing that the allegations were false. He initially scheduled the Conflict of Interest classes but later informed her that they were canceled. He never rescheduled the classes.

45. Several days after the initial meeting with Mr. Rodriquez, he appeared in the plaintiff's office on the second floor, closed the door and told her that he spoke with defendants DELDUCA and DIAZ and that they had decided that the reprimand and warning would be kept between them (DELDUCA, DIAZ, Mr. Rodriquez and plaintiff) and that it would not be placed in plaintiff's employment file. This statement was false and made with the consent and knowledge of defendants DELDUCA and DIAZ to stop plaintiff from further disputing the Reprimand and Warning so that it could be used as a pretext to further discriminate, create a hostile work environment, take adverse action and treat plaintiff disparately based on her race, color and national origin.

46. From plaintiff's own investigation she learned that the letter or letters of complaint upon which the defendants based the Reprimand and Warning were unsigned, anonymous letters

from three shareholders of Concourse Village who had constantly complained about the Board of Directors and were actively seeking the removal of the Board of Directors. Copies of these letters were not provided to the plaintiff by the defendants until they filed a response to the plaintiff's NYDHR complaint on January 6, 2014 wherein they conceded that the Reprimand and Warning was based solely on the unsigned and anonymous letters which were not previously provided to the plaintiff.

47. Upon information and belief, the BBPO never issued reprimand or warning letters to Caucasians and light-skinned Hispanics based on unsigned, anonymous letter or complaints, creating a hostile work environment, adverse action and disparate treatment based on race, color and national origin by defendants DELDUCA and DIAZ.

48. In the spring of 2013, plaintiff was assigned to work on the "Hands Across the Concourse," event scheduled for April 14, 2013, a collaboration among the BBPO, the Bronx Re-entry Task Force (located within the BBPO) and the Bronx Clergy Roundtable, including fund raising for a tee shirt giveaway. Her responsibilities and the protocols for accomplishing this task were the same as they had been for all special events she worked on while she was the Director of Special Events and after the title of Director of Special Events was taken from her in September of 2011. This included working with the Bronx Overall Economic Development Corporation [hereinafter referred to as "BOEDC"].

49. Upon information and belief, the BBPO paid an annual sum of $300,000.00 to BOEDC to raise funds for BBPO events. The BBPO could neither receive funds for giveaways at special events nor pay for giveaway items at special events. Monies raised for giveaways at special events had to be either paid directly by the sponsor or paid to BOEDC which paid for the giveaways.

50. The procedure for raising funds for giveaways at special events remained the same from the time the plaintiff began her employment with the BBPO office in May of 2009 through at least August of 2013. Funds for giveaways could be raised either before or after giveaways were ordered and before or after the special event was held. When outside funds were not raised for a giveaway for a special event, they were paid for by BOEDC from its annual payment from the BBPO or from surplus funds raised and held by BOEDC.

51. At no time prior to August of 2013 was plaintiff given any instructions, directions or oral or written protocols or policies different than those employed for raising funds for giveaways at special events different from the procedures employed by her and ratified by the defendants since May of 2009.

52. In September of 2011 when the title of Director of Special Events was taken from plaintiff there was a surplus of $16,000.00 in the special event fund with BOEDC raised by plaintiff.

53. In March of 2013 plaintiff ordered 5,000 tee shirts from Kenmar Shirts with the words "One Bronx" printed on the front and "Bronx Borough President Ruben Diaz Jr. Hands Across the Concourse" on the back as a giveaway for the Hands Across the Concourse event. These shirts were ordered without having first raised the funds as had been the practice since plaintiff began employment with the BBPO in May 0f 2009.

54. Plaintiff attempted to raise funds for the tee shirt giveaway both before and after the event, including reaching out to the Yankee organization.

55. On August 9, 2013 defendant DELDUCA contacted plaintiff by phone and informed her in a disrespectful and disparaging manner that he had spoken with Brian Smith of the Yankee organization and Mr. Smith told him that they would not pay for the tee shirt giveaway. Plaintiff

had arraigned for an alternative source of payment for the tee shirts if the Yankees decided not to fund the tee shirts but by the time the Yankees decided they would not fund the giveaway, the alternative funding source was no longer available. Plaintiff continued her efforts to obtain funding for the tee shirts.

56. Plaintiff spoke with defendant DELDUCA about the Kenmar Shirts on September 9, 2013 and informed him that she was continuing to work on finding a funding source. Defendant, DELDUCA's only response was to say "Okay, keep trying."

57. On September 17, 2013 plaintiff was informed that defendant SANCHEZ wanted to set up a meeting with her. The meeting was scheduled for September 19, 2013. On September 19, 2013 plaintiff met with defendant SANCHEZ and Barbara Becker, Director of Human Resources, who gave plaintiff a copy of an email Memo from Kenmar Shirts dated September 18, 2013 demanding payment for the Hands Across the Concourse tee shirts and threatening suit. Defendant SANCHEZ in a threatening and disrespectful manner told plaintiff that the bill was her responsibility, that she would have only until September 24, 2013 to obtain alternate funding or the BBPO would pay the bill directly and she would be required to repay BBPO for the tee shirts herself. Plaintiff attempted to explain the procedure for funding giveaways through BOEDC discretionary funds when funding was not obtained, but defendant SANCHEZ cut her off and did not allow her to speak.

58. At the September 19, 2013 meeting with defendant SANCHEZ, plaintiff learned for the first time that the Reprimand and Warning dated November 14, 2012 had been placed in her employment file contrary to representations made to plaintiff by then General Counsel to the BBPO, Al Rodriquez, that the letter would not be placed in her employment file. This deception was perpetrated with the consent and knowledge of defendants DELDUCA and DIAZ to stop

plaintiff from further disputing the Reprimand and Warning so that it could be used as a pretext to further discriminate, create a hostile work environment, take adverse action and treat plaintiff disparately based on her race, color and national origin.

59. The BBPO had never previously paid for giveaway items at special events directly prior to this event from the time that plaintiff started working at the BBPO. The payments had always been made directly by sponsors or by BOEDC from funds contributed for that event or from surplus funds. The defendants, paid for the giveaway directly from the BBPO solely as a pretext to discriminate, create a hostile work environment, take adverse action and treat plaintiff disparately based on her race, color and national origin.

60. Defendant SANCHEZ memorialized his deadline in an email to plaintiff on September 19, 2013. Plaintiff responded by letter emailed on September 23, 2013 pointing out that nothing she did differed from funding procedures for other giveaways for special events since she began working at the BBPO in May of 2009. The only response that the plaintiff received was an email from plaintiff's assistant on September 25, 2013 stating that defendant DELDUCA wanted to meet with PRICE by 1:30 PM. Plaintiff sent a text to defendant DELDUCA asking if it was a termination meeting and stating that if so she needed to consult her attorney. Defendant DELDUCA responded to plaintiff by text that it was not a termination meeting.

61. Defendant DELDUCA and Barbra Becker were present at the meeting on September 25, 2013. Defendant DELDUCA stated that since plaintiff had mentioned "an attorney" he would not discuss the matter with plaintiff. Instead he gave plaintiff a folder with a second reprimand and warning, dated September 24, 2013 and signed by the defendant DIAZ.

62. The second reprimand and warning letter dated September 24, 2103 contained

intentionally false and defamatory allegations and false statements of office practices and procedures as a pretext to discriminate, create a hostile work environment, take adverse action and treat plaintiff disparately based on her race, color and national origin.

63. Plaintiff was out on sick leave from September 26, 2013 through September 30, 2013 and for migraine headaches but responded to these false statements and allegations by letter dated September 30, 2013 emailed to defendant DELDUCA. On the same day plaintiff received an email from defendant SANCHEZ containing a termination letter.

64. Upon information and belief, plaintiff was terminated as a result of the defendants' intentional and deliberate discrimination, creating a hostile work environment, adverse action and disparate treatment of plaintiff based on her race, color and national origin and in retaliation for plaintiff answering the false statements and allegations used as a pretext to as a pretext to discriminate, create a hostile work environment, take adverse action and treat plaintiff disparately based on her race, color and national origin.

65. On and after September 30, 2013, and continuing, the defendants have made false and defamatory statements regarding the plaintiff to other employees at the BBPO, the City of New York, and State and City officials to injure plaintiff and make it difficult for her to obtain employment as part of their discrimination and retaliation of plaintiff based on her color, race and national origin. While this allegation was not raised in the original charge filed by plaintiff with NYDHR, it is respectfully submitted that it is "reasonably related" to the allegation in plaintiff's original charge.

66. Plaintiff filed for unemployment benefits on October 5, 2013. The defendants opposed her application for unemployment benefits claiming that plaintiff was terminated for cause. Defendants appeared and fully participated in a hearing before an Administrative Law

Judge for the State of New York Department of Labor. There was an initial determination disqualifying the plaintiff from receiving unemployment benefits on the basis that she was terminated through misconduct. That initial determination was overruled by the State of New York, Unemployment Insurance Appeal Board, finding that the plaintiff was not terminated for misconduct.

67. The defendants opposed plaintiff's application for unemployment benefits as part of their discrimination and retaliation of plaintiff based on her color, race and national origin. While this allegation was not raised in the original charge filed by plaintiff with NYDHR, it is respectfully submitted that it is "reasonably related" to the allegation in plaintiff's original charge and constitutes a further incidence of discrimination and retaliation in the same manner as alleged in the original NYDHR charge.

## DAMAGES

68. As a direct and proximate consequences of defendants' unlawful, discriminatory and retaliatory action, plaintiff suffered emotional and physical distress, anguish, and humiliation, loss of income, including salary, longevity pay, pension and other benefits, all of which she is entitled to recover in this action.

69. Plaintiff seeks to be made whole and to be reinstated with back pay to her former position or to be awarded front pay in lieu of reinstatement, and seeks recovery for compensatory damages, including damages for personal and physical injuries, and other fringe benefits, including pension benefits, and punitive damages against the individual defendants for defendants' actions, and interest, reasonable attorney fees and costs.

### AS AND FOR A FIRST CLAIM FOR MONETARY RELIEF UNDER TITLE VII AGAINST THE DEFENDANTS THE CITY OF NEW YORK AND THE OFFICE OF THE BRONX BOROUGH PRESIDENT

70. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

71. Plaintiff alleges that the Title VII violations were motivated by discriminatory animus and ill will due to race, color and national origin, and retaliation.

72. The actions of the defendants support a Title VII claim for money damages for color, race, and national origin discrimination and retaliation against defendants THE CITY OF NEW YORK AND THE OFFICE OF THE BRONX BOROUGH PRESIDENT.

### AS AND FOR A SECOND CLAIM FOR PROSPECTIVE AND INJUCTIVE RELIEF UNDER TITLE VII AGAINST THE DEFENDANTS THE CITY OF NEW YORK AND THE OFFICE OF THE BRONX BOROUGH PRESIDENT

73. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

74. The actions of the Defendants support a Title VII claim for prospective and injunctive relief for color, race and national origin discrimination and retaliation against defendants THE CITY OF NEW YORK AND THE OFFICE OF THE BRONX BOROUGH PRESIDENT.

### AS AND FOR A THIRD CLAIM FOR PROSPECTIVE AND INJUCTIVE RELIEF UNDER 42 U.S.C. § 1983 AGAINST THE DEFENDANT OFFICIALS RUBEN DIAZ, JR., PAUL DELDUCA AND RAYMOND SANCHEZ

75. Plaintiff repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

76. The actions of the Defendants support a claim under 42 U.S.C. § 1983 for prospective and injunctive relief for color, race and national origin discrimination and retaliation against